# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 14, 2005          Decided July 15, 2005

No. 04-5171

TIMOTHY C. PIGFORD *ET AL.*,
APPELLANTS

v.

MIKE JOHANNS, SECRETARY,
THE UNITED STATES DEPARTMENT OF AGRICULTURE,
APPELLEE

———

No. 04-5172

CECIL BREWINGTON *ET AL.*,
APPELLANTS

v.

MIKE JOHANNS, SECRETARY,
THE UNITED STATES DEPARTMENT OF AGRICULTURE,
APPELLEE

———

Appeals from the United States District Court
for the District of Columbia
(No. 97cv01978)
(No. 98cv01693)

———

*Alexander J. Pires, Jr.* argued the cause for the appellants.

*Howard S. Scher*, Attorney, United States Department of Justice, argued the cause for the appellee. *Peter D. Keisler*, Assistant Attorney General, United States Department of Justice, *Kenneth L. Wainstein*, United States Attorney, and *Robert M. Loeb*, Attorney, United States Department of Justice, were on brief.

Before: SENTELLE, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Separate opinion concurring in part and dissenting in part filed by *Circuit Judge* ROGERS.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: This appeal arises from a longstanding discrimination action by black farmers against the United States Department of Agriculture (Department) alleging racial discrimination in the administration of federally-funded credit and benefit programs. The appellants are farmers whose discrimination claims were denied in adjudications conducted pursuant to a Consent Decree and whose petitions for review of the adverse adjudications were rejected as untimely because they were filed after the stipulated deadlines that the parties negotiated and the court approved in a Stipulation and Order (S&O). The appellants challenge the district court's denial of their motions for relief from the stipulated deadlines under Fed. R. Civ. P. 60(b)(5) and the court's inherent equitable authority. Because the court did not abuse its discretion in denying the motions, we affirm its judgment.

## I.

In 1997 a class of black farmers filed this action in the district court alleging racial discrimination in violation of the

Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.*[1] On April 14, 1999 the district court entered the Consent Decree which established a two-track system for resolving the individual class members' claims. *Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999), *affirmed*, 206 F.3d 1212 (D.C. Cir. 2001). Under Track A, a class member with little or no documentary evidence could submit his claim to an adjudicator and obtain payment of $50,000 and forgiveness of debt owed the Department if he proved discrimination by substantial evidence. Such a claimant "has a fairly low burden of proof but his recovery is limited." *Id.* at 96. Track B, by contrast, set no dollar cap on a claimant's recovery but the claimant must prove discrimination by a preponderance of the evidence, "a higher burden of proof." *Id.* A claimant in either track could file a petition for review of an adverse decision by the adjudicator with an independent monitor who "shall direct the adjudicator to reexamine the claim if he determines that 'a clear and manifest error has occurred' that is 'likely to result in a fundamental miscarriage of justice.' " *Id.* at 97 (quoting Consent Decree ¶ 12(b)(iii), at 21.

Because the Consent Decree provided no timetable for seeking review by the monitor, the parties negotiated filing deadlines which are set out in the S&O entered by the district court on July 14, 2000. Under the S&O any claimant who had received an adverse adjudicator decision as of the date of the S&O had 120 days from that date (i.e., by November 13, 2000) to file a petition with the monitor. Any claimant who received

---

[1] The complaint also alleged violation of the Fifth Amendment to the United States Constitution, the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.,* and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* but, according to the district court, "both sides agree that this case essentially is brought under the Equal Credit Opportunity Act." *Pigford v. Glickman*, 185 F.R.D. 82, 86 (D.D.C. 1999), *affirmed*, 206 F.3d 1212 (D.C. Cir. 2001).

an adverse decision after the S&O's date had 120 days from the date of the adjudication to file a petition. The S&O expressly recites: "No extensions of these deadlines will be granted for any reason." *Id*.

On October 31, 2000 the claimants' class counsel filed a motion seeking to "redesign" the "unworkable" petition filing process, noting that as of that date counsel had filed petitions on behalf of only 297 of the 3,873 claimants requesting filing assistance. Pls.' Mot. for Expedited Hearing at 7, 3-4 (filed Oct. 31, 2000). Following a conference with the parties the district court issued an order on November 8, 2000 directing that, in lieu of a completed petition for each of the claimants, counsel could satisfy the November 13, 2000 deadline by submitting a "Register of Petitions" (Register) which simply listed the name and claim number of each claimant who had sought counsel's assistance in filing a petition for review of an adverse decision issued as of the S&O date. *Pigford v. Glickman*, C.A. Nos. 97-1978, 98-1693 (D.D.C. filed Nov. 8, 2000), 2000 WL 34292618. The court explained that, while "counsel should be held to the commitments to which they agreed," nonetheless "counsel's failings should not be visited on their clients." *Id*. at 3, 4, 2000 WL 34292618, at *1. The court further directed that class counsel file 400 of the Register's petitions by December 15, 2000 and another 400 by the 15th of each month thereafter up to a final filing date of May 15, 2001. The order recited: "Under no circumstances shall the Monitor accept supporting materials or withdrawals after May 15, 2001." *Id*. at 5, 2000 WL 34292618, at *3. In effect, the court doubled the stipulated time to file a petition for review of an adjudication decided as of the date of the S&O.

On March 15, 2001 the appellants filed a motion for an order suspending the May 15, 2001 deadline. The district court held a status conference and on April 27, 2001 issued an order directing "that all deadlines set forth in the Court's Order of

November 8, 2000, are suspended until further order of the Court" pending a scheduled meeting on May 1, 2001 between class counsel and outside lawyers "who might be able to assemble a team of *pro bono* lawyers to assist class counsel on an emergency basis." *Pigford v. Veneman*, 144 F. Supp. 2d 16, 20 (D.D.C. 2001). In addition, the court ordered that if, after the May 1 meeting, class counsel decided additional time was necessary they should file a motion for extension no later than May 4, 2001 setting out a "realistic" filing schedule.

After the *pro bono* meeting the appellants proposed extending the filing deadline to September 15, 2001 and the district court so ordered on May 15, 2001, finding the new deadline "both realistic and reasonable" in light of the "impressive commitment made by *pro bono* counsel to assist Class Counsel." *Pigford v. Veneman*, 143 F. Supp. 2d 28, 30 (D.D.C. 2001). The May 15, 2001 order warned that "[u]nder no circumstances . . . shall the Monitor accept supporting materials or withdrawals that are filed after September 15, 2001." *Id.* at 31. Class counsel, with *pro bono* assistance, succeeded in filling all of the remaining petitions by the new deadline.

On July 19, 2002 class counsel filed a motion seeking relief under Fed. R. Civ. P. 60(b)(5) or the court's inherent equitable authority on behalf of 387 claimants whose review petitions had been rejected as untimely. On June 2, 2003 the district court denied the motion, concluding there were no changed circumstances that justified modifying the S&O deadlines (as amended). *Pigford v. Veneman*, 265 F. Supp. 2d 41 (D.D.C. 2003). The claimants moved for reconsideration, which the district court denied on March 10, 2004. *Pigford v. Veneman*, 307 F. Supp. 2d 43 (D.D.C. 2004). This appeal followed.

## II.

The appellants comprise two groups of late-filing claimants: (1) those represented by class counsel, now numbering 92, and some 208 others who either proceeded *pro se* or were represented by lawyers unaffiliated with class counsel. Class counsel argues on behalf of each group that the district court erred in denying relief from the filing deadlines under either Rule 60(b)(5) or its inherent equitable power. We review the district court's decision whether to modify a consent order, either under Fed. R. Civ. P. 60(b)(5) or pursuant to its inherent authority, for abuse of discretion. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 389 (1992) (Rule 60(b)); *Shepherd v. Am. Broad. Cos.,* 62 F.3d 1469, 1475 (D.C. Cir. 1995) (inherent authority). We conclude the district court did not abuse its discretion in denying the appellants' motion for relief.

### *A. Class Counsel Petitions*

The district court denied the appellants' motion for relief as to the 92 petitions filed late by class counsel because the appellants failed to demonstrate "changed circumstances" to warrant modifying the S&O schedule under Rule 60(b)(5), which provides in relevant part: "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) . . . it is no longer equitable that the judgment should have prospective application . . . ." The appellants challenge the court's Rule 60(b)(5) decision on two grounds. We address each in turn.

First, the appellants assert the district court incorrectly invoked Rule 60(b)(5) because the rule governs only orders that are final.[2] The appellants contend that the S&O was not a final

---

[2]Initially the appellants moved to modify the S&O under Rule 60(b)(5). It was not until their motion for reconsideration that they

order and that therefore the court should have decided whether to grant relief solely under its inherent equitable authority. *See Envtl. Defense Fund, Inc. v. Costle*, 636 F.2d 1229, 1240 (D.C. Cir. 1980) ("The power of a District Court sitting as a court of equity to modify the terms of a settlement agreement it previously adopted cannot be drawn into question."). As a practical matter, it makes little difference whether the district court resolved the motion under Rule 60 or under its equitable authority as the standard for each is substantially the same. *Compare Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992) (under Rule 60(b)(5), "a party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance"), *with Envtl. Defense Fund, Inc,* 636 F.2d at 1240 ("[S]ound exercise of judicial discretion may require that terms of a consent decree be modified when there has been a significant change in the circumstances obtaining at the time the consent decree was entered."). Nonetheless, we conclude that the court correctly invoked Rule 60(b)(5).

The appellants do not dispute that the Consent Decree itself is final within the meaning of Rule 60(b)(5). *See* Appellants' Br. at 19. They contend, however, that because the S&O simply "establish[es] procedures for enforcing or implementing the

---

first suggested the S&O was not final and therefore not subject to Rule 60(b). Hedging their bets on appeal, they invoke the court's jurisdiction either under 28 U.S.C. § 1291, which establishes this court's "jurisdiction of appeals from all final decisions of the district courts of the United States," or under 28 U.S.C. § 1292(a)(1), which allows appeals of "[i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court." *See* Appellants' Br. at 1.

decree," the S&O is "not considered 'final' within the meaning of Rule 60." *Id*. (citing *United States v. W. Elec. Co.*, 777 F.2d 23 (D.C. Cir. 1985); *Bogard v. Right*, 159 F.3d 1060 (7th Cir. 1998)). The authorities the appellants cite do not support their position. In *Western Elec.* this court reviewed the district court's denial of a request for waiver from restrictions in a consent decree based on the district court's decision not to consider the merits of such a waiver request until a later time when " 'there is substantial competition in local tele-communications service.' " 777 F.2d at 25 (quoting *United States v. W. Elec. Co.,* 592 F. Supp. 846, 868 (D.D.C. 1984)). We explained that the district court's order denying the request was not "final" "because the district court contemplated further proceedings before ruling on the requests." *Id*. at 26. Similarly in *Bogard*, the Seventh Circuit concluded that an order that extended the term of a monitor initially appointed for a three-year term "unless extended by order of this court" was not a final order because it had "no termination date" and therefore "[t]he postjudgment proceeding could drag on for many years and involve a host of far-reaching orders the consequences of which could not be undone when (if ever) the postjudgment proceeding ended with a showing of compliance so complete that the monitor's services could be dispensed with." 159 F.3d at 1062-63. By contrast, the district court's S&O fixed *final* deadlines for filing petitions with the monitor. *See* S&O ¶ 5, at 4 ("No extensions of these deadlines will be granted for any reason."). As with the Consent Decree, which the S&O supplemented, no further court action was contemplated at the time the S&O issued. That the S&O was in fact subsequently modified by the court in response to the appellants' requests does not make it any less final. Such modification of a final order is precisely what Rule 60(b) contemplates.[3]

---

[3]Because the S&O is a final order subject to Rule 60(b), the district court's order denying relief is likewise final so that we have

Next, the appellants contend that even if the S&O is a final order subject to Rule 60(b), the district court abused its discretion in failing to modify the S&O for changed circumstances. Again we disagree.

In the June 2, 2003 order denying the appellants' motion for relief, the district court rejected their contention that "the large volume of claimants requesting assistance with petitions during a short period of time" constituted a changed circumstance because it "occurred *before,* not after, the relevant deadlines were agreed to by the parties and endorsed by the Court." 265 F. Supp. 2d at 46 (emphasis by court). The court explained: "The exponential increase in claimants was fully apparent when plaintiffs and defendant negotiated and agreed to the July 14, 2000 Stipulation and Order, including its clear provision that 'no extensions of these deadlines will be granted for any reason.' " *Id*. at 46 (quoting (S&O ¶ 5, at 4)). The appellants do not quibble with the court's analysis, *see* Appellants' Br. at 22, but contend the court abused its discretion by failing to grant relief based on four other changed circumstances: (1) the unusually high number of claimants with meritorious grounds for review of their claim denials (caused by an unusually high rate of errors by the adjudicators); (2) the extreme work load borne by the two small class counsel firms because outside "of counsels" participated only "minimally" in the review petition filing (particularly after the court's March 8, 2001 ruling that attorney's fees for monitor review work not be available until after readjudication of reviewed claims produced a "disincentive to work on the monitor review process," Appellants' Br. at 24);

appellate jurisdiction under 28 U.S.C. § 1291 rather than under 28 U.S.C. § 1292(a)(1), *see supra* note 2. *See Lasky v. Cont'l Prods. Corp.* 804 F.2d 250, 253 (3d Cir. 1986) (" '[I]t is now well established that orders denying a motion for relief from a judgment under Civil Rule 60 are final.' " (quoting 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3916, at 610-11 (1976)).

(3) the exhaustion of class counsel's funds and credit by March 2, 2001; and (4) the "extra step" created by the Register provision. It is no surprise that the district court did not address these four changed circumstances in its initial decision as the appellants raised them for the first time in their motion for reconsideration. *Compare* Pls.' Mem. in Supp. of Mot. for Relief at 32-34 (filed July 19, 2002) *and* Pls.' Reply to Def.'s Opp'n to Mot. for Relief at 4-7 (filed Nov. 6, 2002) *with* Pls.' Mot. for Recons. at 9-16 (filed June 16, 2003). When the court addressed these newly raised circumstances in the reconsideration order, its response was admittedly brief: "The Court is well aware of the circumstances surrounding these petitions and further elaboration does not change this Court's opinion that plaintiffs have not demonstrated changed circumstances sufficient to justify modification of the Court's Orders under Rule 60(b)(5)." 307 F. Supp. 2d at 48. The court's brevity, however, is understandable given what had come before.

To the extent the four new circumstances adversely affected the petition filing process, the court had already taken them into account and provided the appellants with relief. In response to class counsel's October 31, 2000 plea of an unexpectedly high volume of meritorious review petitions, the court modified the S&O on November 8 to permit class counsel to satisfy the November 13, 2000 filing deadline through the simple Register listing, a remedy the appellants accepted without complaint.[4] When class counsel sought relief in spring 2001 because of their

---

[4]Contrary to the appellants' characterization, the Register was *not* an "extra step" but a substitute step, and a less onerous one, which relieved class counsel of their commitment to file all petitions by the November 13, 2001 deadline. The district court therefore reasonably rejected the notion that the Register was a changed circumstance warranting relief.

depleted resources, both financial and human,[5] the court granted a four-month extension until September 15, 2001, by which deadline all of the remaining petitions were filed. Given the district court's repeated accommodation of class counsel's continuing delinquency, we cannot say the court abused its discretion in denying the appellants' motion for further relief.[6]

The dissent contends the district court erred in two respects. First, it argues the court erred in relying on a finding of fact that the "critical changed circumstances" occurred before the parties agreed to the deadline in the S&O. Dissent at 5, 11. We perceive no such error. The court was correct when it found as a fact in its June 2, 2003 decision denying relief that "[t]he exponential increase in *claimants* was fully apparent when plaintiffs and defendant negotiated and agreed to the July 14, 2000 Stipulation and Order," 265 F. Supp. 2d at 47, as the

---

[5] After the court ordered payment of an interim $7 million fee award on August 4, 2000, class counsel did not seek additional fees until they moved for a third interim award on January 12, 2001, when they did not allege any existing financial hardship but only that they the n "*face[d]* significant hardship based on their financing of the implementation of the Consent Decree" for which they had "incurred substantial financial obligations in the form of bank loans." Mem. in Supp. of Mot. for Third Award of Atty's Fees at 3 (filed Jan. 12, 2001) (emphasis added).

[6] The court's abbreviated response on reconsideration may have been influenced as well by its perception of class counsel's indifference toward the filing deadlines: "At the April 19 status conference, Class Counsel made the remarkable admission that they never had a realistic expectation of meeting the November 13, 2000, deadline they had negotiated with the government, nor did they have any intention of meeting the modified May 15, 2001, deadline set by the Court." 144 F. Supp. 2d at 18.

appellants acknowledge.[7]  The district court was also correct when it stated in the June 2, 2003 order that "the critical 'changed circumstance' *on which plaintiffs rely* occurred *before,* not after, the relevant deadlines were agreed to by the parties and endorsed by the Court."  265 F. Supp. 2d at 47 (first emphasis added).[8]  The appellants had argued at that stage that relief from the deadlines was warranted because of "[t]he predominant change in circumstances, since the Consent Decree was approved in 1999," namely, that "the number of participants, with or without counsel, has increased 400-500%, overwhelming the system set up by the Consent Decree," Pls.' Reply to Def.'s Opp'n to Mot. for Relief at 4-5, plainly referring to the increased number of claimants.  It is not at all surprising if, as the dissent notes, Dissent at 3, the court's June 2, 2003 order "ignored the key distinction argued by appellants in the motion for reconsideration" of the order, which was filed on June 16, 2003.  Further, as we noted *supra*, the court had already granted relief from the increase in meritorious petitions when it

---

[7]The appellants state in their brief: "In its June 2, 2003 order, the District Court correctly noted that, as of July 14, 2000 plaintiffs were aware of the vastly greater number of claimants than originally had been anticipated."  Appellants' Br. at 22.

[8]Notwithstanding the contrary suggestion in the Dissent at 11, the only reference to "critical changed circumstances" in the reconsideration decision came when the court repeated the statement first made in its June 2, 2003 decision to explain (correctly) that the new argument raised by lawyers who had been "of counsel" when the S&O was entered—that the S&O "itself was a change in circumstances" because non-class counsel "was not involved in the decision to negotiate and agree to the deadlines imposed" in it—likewise suffered from " 'the fundamental flaw . . . that the critical 'changed circumstance' on which plaintiffs rely occurred *before,* not after, the relevant deadlines were agreed to by the parties and endorsed by the Court.' " 307 F. Supp. 2d at 49 (quoting 265 F. Supp. 2d at 46).

established the simplified Register procedure for meeting the November 13, 2000 filing deadline.

Second, the dissent asserts the district court erred as a matter of law by failing to consider whether class counsel's failures to meet the deadlines amounted to an "unforeseen obstacle warranting relief." Dissent at 11. The dissent relies on the court's decision in *Pigford v. Veneman*, 292 F.3d 918 (D.C. Cir. 2002) (*Pigford I*), for the proposition that "where class members lack competent counsel, counsel's failure to meet deadlines itself may amount to an 'unforeseen obstacle' that makes the decree 'unworkable.' " Dissent at 6 (quoting *Pigford I*, 292 F.3d at 925). *Pigford I*, however, presented a different situation in two respects. First, contrary to the dissent's characterization, *Pigford I* did not present "the *same* issue of modification of deadlines" as here, Dissent at 9 (emphasis by dissent), so as to implicate law of the case. In *Pigford I* the court modified the consent order to permit arbitrators to extend the deadlines for filing evidentiary materials in Track B litigation, set out in paragraph 10 of the Consent Decree, based on class counsel's "malpractice" in the Track B litigation, namely, "its inability to represent all Track B claimants adequately,' " *Pigford I*, 292 F.3d at 925 (quoting 182 F. Supp. 2d at 52), as exemplified by one lawyer's failure to timely file a claimant's direct testimony with the arbitrator. Here, the appellants seek to modify the S&O's Track A deadlines for filing review petitions under paragraph 12(b)(iii), relying on their repeated failures to meet the filing deadlines. Second, *Pigford I* came before us in a different posture. In that decision, we rejected the district court's determination that the consent decree could be interpreted to permit extending deadlines but affirmed the decision to extend deadlines based on the alternative ground, not addressed by the district court, that the decree could be so modified under Rule 60(b)(5) because counsel's failures amounted to changed circumstances warranting relief under Rule 60(b)(5). Because we affirmed the district court's

decision, we were free to do so, as we did, on a ground not reached by the district court and without reviewing the district court's rationale. *EEOC v. Aramark Corp*, 208 F.3d 266, 268 (D.C. Cir. 2000) ("Although the district court never addressed the safe harbor provision, the issue is fully briefed, and because we review the district court's judgment, not its reasoning, we may affirm on any ground properly raised.") (citing *Doe v. Gates,* 981 F.2d 1316, 1321-22 (D.C. Cir. 1993)).  In this case, however, we review the district court's decision *not* to grant relief and "may overturn such an order only for abuse of discretion." *Summers v. Howard Univ.*, 374 F.3d 1188, 1192 (D.C. Cir. 2004) (citing *Computer Prof'ls for Soc. Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 903 (D.C. Cir. 1996); *Twelve John Does v. District of Columbia,* 841 F.2d 1133, 1138 (D.C. Cir. 1988)).  Although the district court might have been warranted in modifying the deadlines based on class counsel's failure to meet deadlines, as we explained *supra*, the court did not abuse its discretion in declining to do so.  For us to decide the question *sua sponte* or require the district court to do so as a matter of law, as the dissent suggests, would infringe on the district court's discretion and run counter to "the presumption of client accountability for attorney conduct" which, as we confirmed in *Pigford I*, applies in class actions.  *See Pigford I*, 292 F.3d at 927.

### B. Pro Se and Unaffiliated Counsel Petitions

Next, the appellants contend the district court abused its discretion in denying relief under its inherent equitable authority to the late filing claimants who were not represented by class counsel and did not, class counsel contends, receive actual notice of the S&O deadlines.[9]  In their motion for relief the

---

[9]We note that the appellants did not establish below that all of the 208 claimants in fact lacked notice and there is reason to believe that at least some of them did not. *See* Surreply to Pls.'Reply to Def.'s

appellants cited lack of notice as a "changed circumstance" supporting modification of the S&O under either Rule 60(b)(5) or the court's inherent authority because "Track A decision letters issued after July 14, 2000 mistakenly omitted language informing claimants that they had 120 days from the date of the decision to petition the Monitor for review." Pls.' Mem. in Supp. of Mot. for Relief at 13-14. The district court rejected this argument because the S&O did not require the letters to include such notice and therefore its absence was not a changed circumstance.[10] On reconsideration, the appellants took a different tack, arguing that when class members "do not receive actual notice of a deadline by which they must take some action to preserve their claims, and therefore miss the deadline, the District Court may 'exercise its equitable authority to excuse the late filings.' " Pls.'Reply to Def.'s Resp. to Mot. for Recons. at 11-12 (quoting *In re Orthopedic Bone Screw Prods. Liability Litig.*, 246 F.3d 315, 320 (3d Cir. 2001) (alteration original)). The appellants further urged the court to apply the "excusable neglect" standard in exercising its inherent authority as well as the four factors the Third Circuit adopted under the standard in *Orthopedic*, namely:

---

Resp. to Mot. for Recons. at 6 (filed Aug. 15, 2003).

[10]The S&O expressly required only that a copy of its text be posted in every Department Farm Services Agency county office and mailed to everyone who "requested a Claim Sheet and Election Form" but "did not submit a [timely] completed Claim Form." S&O ¶ 7, at 5. The actual notification procedures, however, were far more extensive as the monitor mailed notices to all claimants who filed a completed claim form by August 17, 2000 (approximately 20,652 in all) and all decision letters sent after November 15, 2001 explained the filing deadline. Monitor's Report to Court Regarding Class Notice at 3-5.

> 1) the danger of prejudice to the nonmovant; 2) the length of the delay and its potential effect on judicial proceedings; 3) the reason for the delay, including whether it was within the reasonable control of the movant; and 4) whether the movant acted in good faith.

246 F.3d at 322-23 (citing *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 395 (1993)). The district court applied the Third Circuit's formulation and under the first and third factors found no excusable neglect warranting equitable relief because of the potential prejudice to the Department and the appellants' role in drafting the S&O. The court concluded (1) that the government " 'will "be prejudiced to the tune of almost one million dollars" if the Court permits consideration of the late petitions and if even five percent of them are successful,' " 307 F. Supp. 2d at 50 (quoting *Pigford v. Veneman,* 265 F. Supp. 2d at 50), and (2) "because the deadlines were negotiated and agreed to by plaintiffs, it logically follows that the resulting failure to meet those deadlines had been within the reasonable control of plaintiffs," *id*. at 50-51. In so concluding the court did not abuse its discretion. As the district court pointed out in the May 27, 2001 order suspending the deadlines: "As part of the bargain struck between the parties and approved by the Court in the Order of July 14, 2000, class counsel agreed to meet the 120 day deadline in return for the government's agreement to admit more than 1,100 Track A claimants into the class who otherwise would have been excluded." 144 F. Supp. 2d at 19 n.2. If the district court had granted the requested relief from the deadlines, the government would have lost the benefit of its bargain—certainty and finality as to its maximum liability as of the agreed upon date—while the claimant class would have recovered the bargained-away right to compensation for claimants filing review petitions

beyond the stipulated deadlines (as extended by the court).[11] The prejudice to the government distinguishes this case from *In re Orthopedic* in which the court found the defendant would suffer no prejudice because the addition of claimants would have "no effect on the amount [the defendant] would pay to those aggrieved by its products" as its liability had been capped by a settlement agreement. 246 F.3d at 323. Here, because there is no cap, the expansion of the number of successful claimants (which would result from extending the deadline) will substantially expand the Department's monetary liability. *See id*. (noting consideration of prejudice there was "a unique inquiry" and expansion of plaintiff class "in the ordinary class action will be to the detriment of the defendant"); *cf*. *Grace v. Detroit,* 145 F.R.D. 413, 417 (E.D. Mich. 1992) ("Unlike the cases cited by Plaintiff, . . . in this case there is no fixed settlement fund. Every tardy claim accepted would be an expansion of Defendant City's liability for a reason not originally ordered. The total sum of Defendant's liability is yet to be determined, and increases with each successive claimant.").

---

[11]The dissent inexplicably faults our reference to the district court's May 27, 2001 finding that the government bargained for the November 13, 2000 filing deadline in explaining the district court's finding of prejudice to the government made in its June 2, 2003 order denying the appellants' motion for Rule 60(b) relief. *See* Dissent at 13. We doubt that in the interim the district court either forgot or changed its mind about the quid pro quo nature of the order setting the deadlines, the modification of which, the court found, would prejudice the government in an amount upwards of $1 million. Nor do we agree with the dissent's characterization of the district court's findings regarding the government's negotiation of the July 14, 2000 S&O deadline and potential prejudice from its extension as "ironic" or in any way inconsistent with its earlier finding on the fairness of the Consent Decree (which notably lacked a filing deadline) in its April 14, 1999 order. *See* Dissent at 13.

For the foregoing reasons, the district court's orders denying the appellants' motions are affirmed.

*So ordered.*

ROGERS, *Circuit Judge,* concurring in part and dissenting in part: The history of this litigation bears witness to the many obstacles to relief for the class of African American farmers covered by a consent decree based on their allegations of unlawful racial discrimination by the United States Department of Agriculture in administering its farm loan programs. The task has not been easy for a number of reasons, including the complications necessarily associated with ensuring relief to eligible class members and the deficiencies of class counsel, as determined by the district court. While the district court's efforts so far have ensured that only a small portion of the class will not have their claims for Monitor review considered, as a result of the court's decision today, the claims of 305 class members are unduly extinguished: 97 farmers will lose the opportunity to have independent administrative review of their claims by a Monitor in accordance with the claims procedure in the consent decree, and 208 farmers (170 without counsel), who may not have received notice of the filing deadlines, will lose their opportunity to pursue their claims at all.

In denying appellants' motion of July 19, 2002 for relief for these 305 class members, and the motions for reconsideration of June 13 & 16, 2003, the district court clearly erred in relying on a finding of fact regarding the increased claims workload, and erred, alternatively, as a matter of law by failing to consider, in accordance with *Pigford v. Veneman,* 292 F.3d 918 (D.C. Cir. 2002) ("*Pigford I*"), whether class counsel's untimely filings was a changed circumstance within the meaning of Federal Rule of Civil Procedure 60(b)(5). It also erred by failing to inquire whether 208 claimants' late filings were due to the inadequacy of the notice procedures before determining whether to deny any relief under Federal Rule of Civil Procedure 6(b). Accordingly, while I concur in the holding that the July 14, 2000 Order establishing the original filing deadlines was a final appealable order, *see* Op. at 8, I would reverse and remand the case to the

district court to determine whether the filing deadlines were "unworkable," and thus warranting relief for 97 class members pursuant to Rule 60(b)(5), and to determine whether 208 class members failed to receive notice of the filing deadlines as a result of inadequate notice procedures and were entitled to relief under Rule 6(b).

## I.

The question on appeal is whether the district court abused its discretion in denying appellants' motions for an extension of the filing deadlines, and for reconsideration under Rule 60(b). *Evans v. Williams,* 206 F.3d 1292, 1299 (D.C. Cir. 2000); *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992). While our review is deferential, an abuse of discretion occurs when the district court relies on clearly erroneous findings of fact, fails to consider a relevant factor, or applies the wrong legal standard. *See In re Vitamins Antitrust Class Actions,* 327 F.3d 1207, 1209 (D.C. Cir. 2003); *Evans*, 206 F.3d at 1298; *Marina Mgmt. Servs. Inc. v. Vessel My Girls,* 202 F.3d 315, 321 (D.C. Cir. 2000); *see also Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995).

Rule 60(b)(5) provides, in relevant part, that "the court may relieve a party . . . from a final judgment, order or proceeding [if] . . . it is no longer equitable that the judgment should have prospective application." Fed. R. Civ. P. 60(b)(5). A movant under Rule 60(b)(5) must demonstrate "changed circumstances" since the entry of the judgment from which relief is sought. *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 383, 385 (1992). Such change need not be "unforeseeable, but only unforeseen." *Id.* at 385. The Supreme Court in *Rufo* explained,

> Ordinarily . . . modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree.

[citations omitted] If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).

*Id.* In *Pigford I,* the court held that changed circumstances may include "unforeseen obstacles" that make an order "unworkable." *Pigford I,* 292 F.3d at 925; *see Rufo,* 502 U.S. at 384.

The district court found that the large increase in the number of claimants occurred *before* the deadlines in the July 14th Order were agreed to, and therefore did not amount to unanticipated "changed circumstances" rendering the deadlines "unworkable" within the meaning of Rule 60(b)(5). *See Pigford v. Veneman,* 265 F. Supp.2d 41, 47 (D.D.C. 2003), *reconsideration denied*, *Pigford v. Veneman*, 307 F. Supp.2d 43 (D.D.C. 2004). In so finding the district court, as does the court today, Op. at 12-13, ignored the key distinction argued by appellants in their motion for reconsideration and supported by evidence in the record. Appellants pointed out that the critical "changed circumstance" was not the vastly greater number of *total* claimants, but the unanticipated large number of claimants seeking Monitor review because their claims likely had been denied erroneously in the first instance by the adjudicator, and had potentially meritorious grounds for seeking Monitor review. Appellants explained that class counsel originally had anticipated that the vast majority of would-be seekers of Monitor review would not meet the high standards for such review set forth in the consent decree — "clear and manifest error" that is "likely to result in a fundamental miscarriage of

justice," Consent Decree ¶ 12(b)(iii) — and therefore, at the time they agreed to the July 14th Order deadlines, had estimated that only approximately 2,500 petitions would require processing for Monitor review. However, class counsel subsequently discovered that a much higher number of the claims rejected by the adjudicator were potentially meritorious claims even under the high standard for Monitor review. In fact, the total volume of claims actually processed for Monitor review was much higher than 2,500: Class counsel and the of-counsel law firm Chestnut, Sanders ended up processing 3,700 Track A requests for Monitor review, with other firms processing other, smaller numbers of requests.

In support of this distinction, appellants pointed to the high success rates of claims upon Monitor review: The facilitator's report cited by appellants indicated that approximately 48% of the claimants who had filed for review with the assistance of counsel had been approved by the Monitor for reexamination by the adjudicator, and 100% of reexamined petitions prevailed on the merits. This statistical evidence substantiated class counsel's argument that many meritorious claims had been erroneously denied by the adjudicator, necessitating the filing of petitions for Monitor review and creating more work for class counsel than was anticipated when the July 14th Order deadlines were agreed to.

The record further indicates that the number of class members seeking Monitor review was unanticipated by either party or by the district court when the parties agreed to those deadlines. As noted, when the district court established the Register of Petitions process in the November 11, 2000 Order, class counsel was estimating a total of 2,500 petitions for Monitor review. The district court relied on this estimate to set the filing schedule for fully supported petitions. The November 11th Order further indicated that the higher volume of petitions

for Monitor review was not anticipated, for the district court acknowledged that neither the Department nor the Monitor were prepared to handle and process the higher volume of petitions. The court stated:

> It is obvious that if Class Counsel, Of Counsel and all unaffiliated counsel were forced to file thousands of fully supported Petitions by November 13, the government would be unable to respond to them in a meaningful way within the 60 days that it has to file a response. [citation omitted] Furthermore, the Monitor informed the Court at the hearing that even if the government had the resources to complete such a task, the Monitor initially will be unable to decide the Petitions at a pace greater than 200 to 300 each month.

Indeed, the district court later acknowledged at the April 19, 2001 status conference that "some of the failings of the lawyers, if we want to call them that, are simply because people were overworked. *There was much more to be done than people thought.*" (emphasis added).

In light of the record evidence that the high number of class members seeking Monitor review was unanticipated at the time the July 14th Order deadlines were agreed to, the district court clearly erred in relying on its finding in its opinion of June 2, 2003 that the "critical 'changed circumstance'" had "occurred *before*, not after, the relevant deadlines were agreed to," in denying appellants' motion for reconsideration in its opinion of March 19, 2004, *Pigford*, 307 F. Supp. 2d at 48, without distinguishing between the overall number of claimants and the number of petitions for Monitor review. Instead, the district court denied reconsideration stating that, notwithstanding appellants' "further elaboration," "the [c]ourt declines to revisit its determination that the asserted 'changed circumstances'

presented by [appellants] do not justify modification of the [c]ourt's prior orders under Rule 60(b)(5)." *Id.* While the court states that the district court established the Register procedure to provide relief from the increased volume of meritorious petitions, Op. at 13, that relief created filing problems of its own and, in any event, the district court underestimated the volume of Monitor-review petitions even then.

Moreover, in denying appellants' motions, the district court failed to consider the instruction of *Pigford I* that where class members lack competent counsel, counsel's failure to meet deadlines itself may amount to an "unforeseen obstacle" that makes the decree "unworkable" under Rule 60(b)(5). *Pigford I,* 292 F.3d at 925. In *Pigford I*, this court embraced the concept that the district court has a duty to protect class members where such members did not choose their counsel and where retention of other lawyers is unlikely, 292 F.3d at 926-27, a concept embraced by other circuits as well.[1] Noting that the consent "decree's express purpose is to 'ensur[e] that in their dealings with [the Department], all class members receive full and fair treatment,' Consent Decree at 2, and its 'main accomplishment was the *establishment of a process* to adjudicate individual claims,'" this court distinguished between the failings of class

---

[1] *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005) (citing Fed. R. Civ. P. 23(e)); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 321 (3d Cir. 2001); *In re Fine Paper Antitrust Litig.,* 617 F.2d 22, 27 (3d Cir. 1980); *Zients v. LaMorte*, 459 F.2d 628, 629-30 (2d Cir. 1972); *see also In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 307 (3d Cir. 2005); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 280-81 (7th Cir. 2002); *Gonzales v. Cassidy,* 474 F.2d 67, 75 (5th Cir. 1973). While the district court noted that these cases involved earlier stages of class action proceedings, it failed to articulate any reason why this principle would not apply at the remedial stages of class action proceedings. *See Pigford,* 307 F. Supp.2d 43, 50 (D.D.C. 2004).

counsel and the opportunity of class members to avail themselves of the remedial scheme under the consent decree: The court opined that there was "no basis for holding [the class members] responsible for [counsel's] failure" to meet deadlines which had been bargained for by the parties, *Pigford I*, 292 F.3d at 927, and held that relief was appropriate under Rule 60(b)(5) because "class counsel's failure to meet critical Track B deadlines amounts to an 'unforeseen obstacle' that makes the decree 'unworkable,'" *id.* at 927 (quoting *Rufo,* 502 U.S. at 384).

This conclusion in *Pigford I* is no less applicable now than it was then, for "[t]o hold otherwise would sanction the farmers' double betrayal: first by the Department . . . and then by their own lawyers." *Id.* In granting an extension of Track B deadlines missed due to attorney error, the district court had previously acknowledged that the general rule that attorney error is not excusable should not apply here, where "[t]he history of this case is unique . . . and requires more than hasty application of general practice." *Pigford v. Veneman,* 182 F. Supp.2d 50, 52 (D.D.C. 2002). This court observed in *Pigford I* that,

> [T]he decree itself assumes competent representation for the farmers. The decree's express purpose is to "ensur[e] that in their dealings with [the Department], all class members receive full and fair treatment," . . . and its "main accomplishment was the establishment of a process to adjudicate individual claims." . . . Unless the farmers have competent counsel, we cannot imagine how they could ever obtain "full and fair treatment" in a claims process where . . . missing a single deadline could be fatal.

292 F.3d at 927 (quoting Consent Decree, at 2; *Pigford v. Glickman,* No. 97cv01978 (D.D.C. Mar. 8, 2001)). Not only has

the district court found class counsel's performance sanctionable and imposed severe monetary fines on them, *Pigford v. Veneman,* 307 F. Supp.2d 51 (D.D.C. 2004), but at a time when there was, as the district court stated, "much more to be done than people thought," and the critical filing deadlines were drawing near, class counsel and of-counsel were in dire financial straits as a result of the lack of payment of interim fees by the government, as appellants reminded the district court in their motion for reconsideration.[2] The district court recognized at a

---

[2] Six months before the November filing deadline, the motion of May 8, 2000 for an interim award of attorneys' fees, costs and expert fees filed by class counsel and certain of-counsel stated:

> It is now nearly three years since this case began. During this time the firms incurred crushing expense. For example, [class counsel] Conlon, Frantz incurred substantial obligations - borrowing $1,000,000 simply to remain solvent. Mr. Pires was not paid for over 15 months. He obtained multiple mortgages to pay his personal expenses. . . . [The Of-counsel law firm of] Chestnut, Sanders was forced by the scope of the litigation to borrow $1 million, hire new employees and cut partner salaries by 60%.

On August 4, 2000, the district court, acknowledging "the dire financial straits in which several firms affiliated with class counsel currently find themselves," ordered an immediate preliminary award to counsel of $7 million, which covered only previously incurred costs and amounted to less than one-half the cumulative loadstar amount of $14,582,703. Although, in response to class counsel's motion for an extension of the July 14th Order deadlines, the district court set up the Register of Petitions process in November 2000, counsel still missed filing deadlines. When the parties' attempt, at the district court's suggestion, to resolve their differences regarding counsel's May 8th request fees and costs proved unsuccessful, on January 12, 2001 class counsel, of-counsel, and one counsel moved for additional interim fees

status conference held on April 19, 2001 that the delay in awarding interim fees

> had an impact on the number of lawyers and the amount of time that those lawyers are spending *on the Monitor petition process*. . . . if you have to succeed or prevail to get paid, then getting new lawyers in the act would be hard, and I understand that it is also having an impact on the existing lawyers. [Class counsel] has cut back on [its] staff.

(emphasis added).

Today, by affirming the denial of appellants' motions, the court ignores our analysis in *Pigford I* and the duty of the trial judge to protect class members who do not chose their own counsel when unanticipated circumstances have created "a situation where there were too many cases and too few lawyers."

---

alleging "significant hardship" as a result of continued financing of implementation of the Consent Decree, without the regular payment of fees, through bank loans to cover staff salaries and expenses. A further payment of interim fees and costs was ordered on March 8, 2001, well after the filing deadlines, and still, because of the government's resistence, class counsel did not receive any payment until July 2001, of $14.9 million, *see Pigford v. Veneman,* 369 F.3d 545 (D.C. Cir. 2004); a further payment of $500,000 was ordered on December 2, 2002, *Pigford v. Veneman,* 239 F. Supp. 2d 68, 71 (D.D.C. 2002). The delay in approving payment and the delay in actual receipt of interim fees by class counsel are ignored by the court in discussing the district court's "repeated accommodation of class counsel's continuing delinquency." Op. at 11.

Br. for Appellants at 22. By declining to account for *Pigford I*'s contrary holding as an infringement of the district court's discretion, Op. at 14, the court ignores that *Pigford I* involved the *same* unique history, the *same* consent decree, the *same* class counsel, and the *same* issue of modification of deadlines missed by class counsel under Federal Rule of Civil Procedure 60(b)(5) considered in the *same* court, and as such its holding is nearly akin to the law of the case, in addition to being law of the circuit. *See LaShawn A. v. Barry,* 87 F.3d 1389, 1393, 1395 (D.C. Cir. 1996) (en banc). That *Pigford I* involved claims under Track B rather than Track A does not change the fact that the legal issue before the court is the same: whether appellants are entitled to relief under Rule 60(b)(5) for counsel's failures to meet filing deadlines. *See* Op. at 13-14. While the court points out that *Pigford I* acknowledged "the presumption of client accountability for attorney conduct," *id.*, it ignores that *Pigford I* also found this presumption overcome because class counsel was not freely chosen by class members and the circumstances of the case, together with the terms of the decree, made retention of other lawyers "unlikely." *Pigford I,* 292 F.3d at 926. Here, the very same circumstances remain, and were further exacerbated by additional unanticipated circumstances which created "a situation where there were too many cases and too few lawyers." Br. for Appellants at 22. This court cannot avoid, by pointing to "a different procedural posture," Op. at 13, that the district court is bound, under *Pigford I*, *see LaShawn A.,* 87 F.3d at 1393, 1395, to separate class counsel's failings from the claims of the class members, particularly in light of the district court's affirmative duty to "renew its stringent examination of the adequacy of class representation throughout the entire course of the litigation," *In re Fine Paper Antitrust Litigation,* 617 F.2d 22, 27 (3d Cir. 1980), and that the district court's failure to do so is an abuse of discretion, *Evans*, 206 F.3d at 1298.

Finally, while the Secretary would distinguish *Pigford I* as concerned with extinguishing a class member's claim, *see Pigford I,* 292 F.3d at 922, from the denial of an opportunity to seek Monitor review, from the perspective of the class member whose claim has been wrongfully denied, the effect is the same: Neither class member will have the opportunity to utilize the remedial process established in the consent decree. Taken together, the circumstances identified in appellants' motions suggest that the 97 class members should not bear the burden of counsel's failures to meet filing deadlines. In order to avoid a "double betrayal" of the class members, the district court was required to separate the failures of counsel from the claims of the class members in order to ensure that the opportunity to pursue the claims process established in the consent decree not be foreclosed. *Id.* at 927. It did not do so, and the court today fails to explain how the district court fulfilled its responsibilities in accordance with the analysis in *Pigford I*.

Because the district court, in denying the motion for reconsideration, erroneously relied on its finding in its opinion of June 2, 2003 that the "critical changed circumstance" occurred before the July 14th Order deadlines were agreed to without taking into account record evidence demonstrating that the volume of petitions for Monitor review – the relevant change in circumstance – was not anticipated at the time the deadlines were agreed to, and in the alternative erred as a matter of law by failing to consider whether class counsel's failures to meet the deadlines amounted to an "unforeseen obstacle" warranting relief, I would reverse and remand the case to the district court to address whether the deadlines were "unworkable" under Rule 60(b)(5).

## II.

Additionally, the district court failed to inquire whether adequate notice was provided to 208 class members, for whom

appellants proffered evidence that these class members had not received notice of the filing deadlines for Monitor review, in determining whether relief was warranted under the "excusable neglect" standard of Federal Rule of Civil Procedure 6(b).

The July 14 Order modified the consent decree to limit the period within which class members could seek Monitor review of denied claims and, as the district court noted, it did not provide for individual notice to unsuccessful Track A class members. Instead, the July 14th Order required only that a copy of it be (1) posted in every USDA Farm Services Agency county office, and (2) sent by the facilitator to those persons who requested a claim sheet and election form. According to the Monitor's Report, "few people eligible to file a petition with the Monitor would have received direct notice of the 120-day deadline from the mailing," and many claimants would not see a posting in a USDA Farm Services Agency county office. *See* Monitor's Report to the Court Regarding Notice to the Class of the 120-Day Deadline to File a Petition for Monitor Review (May 30, 2003). The Monitor attempted to remedy the situation by mailing additional notices to farmers who had either requested or made telephonic inquiries regarding claim forms. Still, appellants proffered evidence that 208 class members had received no notice of the filing deadlines. *See, e.g.,* Joint Appendix at 186; 218-233, 248, 254, 256, 258, 265, 268, 269, 286, 321; *id.* at 423.

Nonetheless, the district court denied relief under the "excusable neglect" standard of Rule 6(b). Applying the four-factor test of *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 398-99 (1993), the district court found first, that the government would be "prejudiced to the tune of almost one million dollars" by allowing consideration of late petitions if five percent were successful, and second, that "because the [July 14th Order] deadlines were negotiated and

agreed to by the [appellants], it logically follows that the resulting failure to meet those deadlines had been within the reasonable control of [appellants]." Each finding is problematic given the district court's duty to ensure that adequate notice procedures were, in fact, established to provide class members with notice of filing deadlines. The district court made no finding that appellants were not proceeding in good faith or that there would be undue delay of the proceedings by granting relief.

The district court's finding of "prejudice" to the government is ironic. *See Pigford v. Glickman*, 185 F.R.D. 82, 95 (D.D.C. 1999); *see also Pigford I*, 292 F.3d at 927. In approving the consent decree, the district court observed that "the settlement is a fair resolution of the claims brought in this case and a good first step towards assuring that the kind of discrimination that has been visited on African American farmers *since Reconstruction* will not continue into the next century." *Pigford*, 185 F.R.D. at 86 (emphasis added). The July 14th Order deadlines were not imposed in order to limit the government's liability as such, but rather, according to the district court, to bring closure to the process through fair procedures that would identify the number of class members seeking Monitor review. Moreover, the dollar amount of prejudice claimed by the Secretary represents 0.04% of the estimated settlement, *see Pigford*, 206 F.3d at 1244, and 0.125% of the amount actual paid out by the government at that time. This court, in turn, mistakenly relies on the Secretary's argument that class counsel's agreement that the July 14th Order deadlines would not be extended was the *quid pro quo* for its agreement to admit other Track A claimants into the class who would otherwise have been excluded. *See* Op. at 16-17; Br. for the Appellee at 24. This is not the analysis adopted by the district court in denying appellants' motions; instead, the district court addressed that *quid pro quo* in imposing monetary

sanctions on class counsel in a separate order, *see Pigford v. Veneman,* 144 F. Supp.2d 16, 19 n.2 (D.D.C. 2001), which is not on appeal.

The district court's second finding, that the failure to meet the deadlines was within the farmers' control because they agreed to the July 14th Order deadlines, is clearly erroneous because it ignored the threshold question of whether the agreed-to notice provisions ensured that adequate notice would be provided to class members, many proceeding *pro se*, whose claims had been denied by the adjudicator. The fact that class counsel agreed to the notice procedures did not discharge the district court's obligation to ensure notice was directed in a reasonable manner. *Cf.* Fed. R. Civ. P. 23(e)(1)(B); *Doe v. Lexington-Fayette Urban County Gov't,* 2005 U.S. App. LEXIS 7771, at *11-12 (3d Cir. 2005); *Pigford I*, 292 F.3d at 926 (citing Fed. R. Civ. P. 23(a)(4)). Once the Monitor determined that the notice procedures were inadequate and appellants proffered evidence that 208 class members claimed not to have received notice, the district court had a duty to inquire whether the notice procedures were adequate in fact. In an analogous context, the Second Circuit pointed out that the district court has "the inherent power and duty to protect unnamed, but interested persons," *Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir. 1972), and although the notice procedures in the settlement agreement were complied with, the Second Circuit reversed the exclusion of claims filed late due to the lack of actual notice, *id.* As the Third Circuit observed, the district court's equitable powers under Rule 23 "are retained by the court until the settlement fund is actually distributed." *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 321 (3d Cir. 2001).

Whether the prejudice to the government outweighed other considerations could not be determined by the district court until it first determined – in light of the proffered evidence that the

agreed-to notice procedures were inadequate for 208 class members – the adequacy of the agreed-to notice procedures, and whether the late filings were the result of inadequate notice. Only then could the district court determine whether the 208 class members were entitled to relief under Rule 6(b). Therefore, I would reverse and remand the case for the district court to determine the adequacy of the notice procedures and whether the 208 class members were entitled to relief. *See Pigford I*, 292 F.3d at 925-27; *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d at 321-29; *Zients,* 459 F.2d at 630.

Accordingly, I respectfully dissent from Part II of the court's opinion.