# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 3, 2006　　　　　　Decided May 19, 2006

No. 05-7098

FG HEMISPHERE ASSOCIATES, LLC,
APPELLEE

V.

DEMOCRATIC REPUBLIC OF CONGO,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv-01314)

———

*Irene M. Solet*, Attorney, U.S. Department of Justice, argued the cause as *amicus curiae* in support of appellant. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Douglas N. Letter*, Attorney.

*Stephen F. Malouf*, pro hac vice, argued the cause for appellant. On the briefs was *Steven D. Cundra*. *Jeffrey M. Sherman* entered an appearance.

*Bradford A. Berenson* argued the cause for appellee. With him on the brief was *Eric A. Shumsky*.

Before: RANDOLPH and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: FG Hemisphere Associates seeks to execute a default judgment against two Washington, DC dwellings owned by the Democratic Republic of Congo ("DRC"). DRC diplomatic officials resided in these properties by virtue of their official capacities up until the mid-1990s, when political disruption led to their removal from office but not from the properties. (In 2005-06, the DRC succeeded in recovering the properties for use as diplomatic residencies.) FG Hemisphere's predecessor-in-interest obtained a default judgment against the DRC for breach of a credit agreement unrelated to the properties. FG Hemisphere then sought writs of execution against the two properties—their first mention in the litigation. The DRC again defaulted. Some two months later, the DRC filed a Rule 60(b) motion to quash the execution order, arguing, among other things, that its failure to respond earlier was due to "excusable neglect" and that the two properties were immune from execution under 28 U.S.C. § 1609 as "property in the United States of a foreign state." The district court denied the motion. The DRC appeals, and we reverse and remand the district court's order. The DRC's neglect in the delay of its response to the motion to execute was excusable.

\* \* \*

In 1980 the DRC (then the Republic of Zaire) and its state-owned electric company Société Nationale d'Électricité ("SNEL") entered into a credit agreement with Energoinvest to finance the construction of an electric power transmission facility in Zaire. The DRC failed to repay, and in 2003, after an arbitration at which the DRC failed to appear, Energoinvest

obtained an arbitration award of roughly $11.7 million. After providing the DRC with formal diplomatic service, Energoinvest in September 2004 obtained a default judgment from the U.S. district court for the District of Columbia confirming the arbitral award. Energoinvest assigned its rights in the award to FG Hemisphere, a company that identifies itself as "financial advisor and investor specializing in sovereign debt obligations in emerging markets."

FG Hemisphere then moved to execute on the DRC's "commercial property . . . in the United States." Motion for Permission to Execute on Judgment and Memorandum in Support Thereof at 5 (Nov. 30, 2004). The motion mentioned no specific "commercial" properties. On March 14, 2005, FG Hemisphere filed an amended motion ("Motion to Execute") seeking to execute on two pieces of DRC real property in Washington, DC: 4001 Linnean Avenue, NW, and 5015 Glenbrook Road, NW. Zaire had originally bought both properties to serve as diplomatic residences. The DRC's Ambassador, Oscar Tatanene Manata, lived in the Linnean property during his ambassadorship (1990-95) and continued there after he lost his position, leaving only in 2005. The DRC Military Attaché lived in the Glenbrook property until 1993, when he was dismissed and moved out; at that point the similarly dismissed DRC Deputy Military Attaché (1988-1993), Elinga Simoke Atembina, either continued to live there or moved in. Compare Decl. of Faida Mitifu ¶ 6 (May 31, 2005) ("Atembina refused to vacate the Glenbrook property when his services were terminated") with Appellant's Br. at 7 ("[A]fter the Glenbrook property was vacated by the Congolese Defense and Army Forces Attaché, Mr. Atembina and his family moved into the residence"). Both Manata and Atembina remained as squatters for over ten years, at least in part as leverage to secure past salaries for diplomatic service. See Manata's Motion to

Intervene at 3-4 (May 2, 2005) (noting DRC judicial judgment that Manata family has a "right of occupancy [in the Linnean property] until the full payment of their salaries and benefits"); Aff. of Manata at 2 (Apr. 29, 2005) (noting that "I [Manata] have not been paid in fourteen years . . . . I must and will remain in this home until the [DRC] settles with me"); Atembina's Motion to Intervene at 2 (May 9, 2005) (noting that "Atembina Family's occupancy is employment right as long as [the DRC] will keep them abroad until the full payment of their salaries and benefits [sic]"); Mem. Order at 2, *Democratic Republic of Congo v. Atembina*, No. LTB05-18459 (D.C. Super. Ct., Jan. 3, 2006) (filed in DRC's Rule 28(j) Letter, Feb. 7, 2006) (noting that Atembina asserts "a right to remain in the Glenbrook property until he is paid salary that he claims is due him"). Over the years the DRC made some efforts to evict them, including a request that the power company cut off electricity for the Linnean address. It finally regained possession of the Linnean property from Manata in 2005 and obtained an eviction order against Atembina in 2006.

On filing the Motion to Execute, FG Hemisphere arranged to deliver it by DHL courier service to the DRC. On March 22—eight days after the motion was filed—the mail department in the DRC Foreign Ministry's Office of Protocol received and signed for the DHL package in Kinshasa, the DRC capital. As delivered, the motion was in English; the DRC's official language is French. Two days later, the district court granted the Motion to Execute ("March 24 Order").

Meanwhile, in Kinshasa the DHL package made its bureaucratic rounds. It went first to the Bureau of Translation, and after translation into French, on to SNEL. SNEL forwarded the package to the Office of Protocol, from which it went first to the Office of Legal Affairs and then, in late May, to the Foreign

Minister's Chief of Staff. For reasons that aren't entirely clear, ex-ambassador Manata learned of the Motion and phoned to alert the Chief of Staff before it arrived in his Kinshasa office. On May 4, evidently no more than a day after the alert from Manata, the current Ambassador of the DRC, Faida Mitifu, was directed to secure counsel. This was more than 40 days after the district court granted the Motion to Execute and, of course, before receipt of the Motion by the Chief of Staff.

The DRC then (1) moved to quash the writs of execution on May 31, (2) filed a Rule 60(b) motion to vacate the March 24 Order on July 7, and (3) filed a Rule 62 motion to stay the execution on July 8. On August 11—the same day that the United States filed a Statement of Interest—the district court denied the DRC's three motions without opinion. The DRC appeals, arguing that the district court erred because (1) the March 24 Order was void under Rule 60(b)(4) for lack of jurisdiction and/or notice, and (2) the DRC's delay in its response to the Motion to Execute qualified as excusable neglect under Rule 60(b)(1).

We review the district court's denial of the Rule 60(b) motion for abuse of discretion. See *Hall v. C.I.A.*, 437 F.3d 94, 99 (D.C. Cir. 2006); *Lepkowski v. United States Dept. of Treasury*, 804 F.2d 1310, 1311-12 (D.C. Cir. 1986). Because the district court provided no explanation for its denial of the DRC's motion, we face several possibilities: either the district court found the DRC's neglect inexcusable, and/or it remained unpersuaded by the DRC's position on the merits. Because we find that the district court abused its discretion insofar as it may have failed to find the DRC's neglect excusable, we do not reach the issue of whether the judgment was void.

6

* * *

Rule 60(b)(1) provides that a court may relieve a party from a final judgment for "mistake, inadvertence, surprise, or excusable neglect." FED. R. CIV. P. 60(b)(1). In *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380 (1993), the Supreme Court held that the determination of excusable neglect is an equitable matter and identified several relevant factors: the risk of prejudice to the non-movant, the length of delay, the reason for the delay, including whether it was in control of the movant, and whether the movant acted in good faith. *Id.* at 395-97. While *Pioneer* involved "excusable neglect" under Bankruptcy Rule 9006(b)(1), cf. *id.* at 393-95, the same test governs our determination under Rule 60(b)(1). See, e.g., *In re Vitamins Antitrust Class Actions*, 327 F.3d 1207, 1209-10 (D.C. Cir. 2003). Though the United States as amicus argues excusable neglect in more detail than the DRC, the latter's opening brief clearly preserved the issue. See *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991).

The factors listed by *Pioneer* are of course not exclusive. See *Pioneer*, 507 U.S. at 395-96; *Robb v. Norfolk & Western Ry. Co.*, 122 F.3d 354, 362 (7th Cir. 1997). In a case applying other sections of Rule 60(b), we've stressed a foreign sovereign's interest—and our interest in protecting that interest—in being able to assert defenses based on its sovereign status. "Intolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations and undermine the State Department's continuing efforts to encourage foreign sovereigns generally to resolve disputes within the United States' legal framework." *Practical Concepts Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1551 n.19 (D.C. Cir. 1987) (Ruth Bader Ginsburg, J.) (internal quotation, brackets,

and ellipsis omitted).  See also *Pulliam v. Pulliam*, 478 F.2d 935, 936 (D.C. Cir. 1973) (noting that in the context of a default judgment "a court should liberally allow relief under" Rule 60(b) because "a resolution on the merits is preferable to a judgment by default"); *Meadows v. Dominican Republic*, 817 F.2d 517, 521 (9th Cir. 1987) (noting that "default judgments are generally disfavored"); *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985) (same); *C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1206 (7th Cir. 1984) (finding that "rule 60(b) is applied liberally in the default judgment context only in the exceptional circumstance" where default was not in "the meaningful control" of the moving party).

Apart from the United States's interest in assuring foreign nations' ability to rely on the U.S. courts, the express *Pioneer* factors favor the DRC.  The duration of the delay, to be sure, is hard to calculate because of uncertainty over when the starting shot was fired—that is, when the DRC received the relevant notice.  FG Hemisphere suggests that delay should be measured from September 2004, when the DRC defaulted in the action to enforce the arbitral award—a point in time, of course, when there had been no mention of executing on the diplomatic properties.  It relies on Rule 5, which says "[n]o service need be made on parties in default for failure to appear except that pleadings asserting new or additional claims for relief against them shall be served upon them in the manner provided for service of summons in Rule 4." FED. R. CIV. P. 5(a).  The DRC and the United States as amicus want to use the March 14, 2005 filing of the Motion to Execute as the starting point.  They argue, moreover, that the attempt to execute against the diplomatic properties *is* a new claim for relief within the meaning of Rule 5(a), thus triggering the rule's reference to Rule 4 (and thus,

under Rule 4(j)(1), to the service provisions of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608).

We do not here decide whether the attempt to reach the diplomatic residences qualifies as a new claim under Rule 5(a). In resolving the equitable question under Rule 60(b)(1), however, we think it appropriate to use the time the Motion to Execute was filed, as that represented the first time that the DRC received the slightest hint that its diplomatic properties were in jeopardy. As we said in *Practical Concepts*, quoting language drawn from the brief of the United States in that case, when a foreign government "has appeared and asserts legal defenses, albeit after a default judgment has been entered, it is important that those defenses be considered carefully and, if possible, that the dispute be resolved on the basis of . . . all relevant legal arguments." 811 F.2d at 1552. The context of the language underscores its force; we used it to explain our decision to give the foreign government an extra chance to establish its jurisdictional immunity under FSIA—even after having just found no substantial basis for immunity. 811 F.2d at 1551.

With the Motion to Execute as the starting point, the roughly two month delay between the deadline to respond to the Motion and the DRC's response (and two-and-a-half month delay between the Motion's filing and DRC's response) was relatively short, especially in light of the distance between the DRC and the U.S. On brief amicus United States, Br. at 26-27, and FG Hemisphere, Br. at 19 n.7, appear to assume that the DRC was entitled to 14 days to respond to the March 14, 2005 motion.[1] Of those 14 days, it took eight simply for the DHL

---

[1] Local rules call for response to a motion within "11 days of the date of *service* [of a motion] or at such other time as the Court may direct, an opposing party shall serve and file a memorandum of points

package to be *delivered* to the DRC. Had the DRC used the same courier service, its response could easily have taken another eight days, until well after the district court ruled. Moreover, the DRC secured counsel only one day after receiving its first actual notice, filing its motion to quash less than four weeks later.

In light of the difficulties, the delay period doesn't seem long in relation to the benchmarks of the rather limited set of cases (none of which, so far as we've discovered, involves comparable international distance complications). See, e.g., *Bateman v. U.S. Postal Service*, 231 F.3d 1220, 1225 (9th Cir. 2000) (finding excusable neglect when delay was over one month because plaintiff left country on a family emergency); cf. *Smith v. District of Columbia*, 430 F.3d 450, 456 n.5 (D.C. Cir. 2005) (noting that delay of "well over a year" militated against finding excusable neglect).

Second, there is no danger of prejudice to FG Hemisphere. Prejudice under Rule 60(b)(1) appears typically and properly to contemplate costs that reconsideration of the final judgment would inflict on the non-moving party *independent of the chance of reversal*. See, e.g., *Bateman*, 231 F.3d at 1224-25. *Pigford v. Johanns*, 416 F.3d 12, 20-22 (D.C. Cir. 2005), is not to the contrary. There, in ruling on courts' Rule 60(b)(5) power to modify an order in light of changed circumstances, we referred to excusable neglect by way of analogy and noted that relaxing a

and authorities in opposition to the motion." LCvR 7(b) (emphasis added). Assuming in favor of FG Hemisphere that service occurred at dispatch rather than delivery, and adding three days under Rule 6(e) for cases where service has been by mail under Rule 5(b)(2)(B), would yield March 28, 2005 as the due date for a response.

consent decree's deadline would lead "the government to be prejudiced to the tune of almost one million dollars." Given our concern in *Pigford* about protecting the benefit of the government's bargain (in which the firm deadline was presumably agreed on in consideration for offsetting benefits for the claimants), *Pigford* cannot be read as making simple exposure to adjudication a qualifying form of prejudice under Rule 60(b)(1). See *id.* at 21 ("If the district court had granted the requested relief from the deadlines, the government would have lost the benefit of its bargain. . . ."). Reliance interests control.

Here, FG Hemisphere used the delay period to appraise and make arrangements to auction off the properties. But these costs appear negligible—FG Hemisphere's brief makes no effort to quantify them or otherwise show their significance. Besides, the DRC in the trial court offered to compensate FG Hemisphere for its expenses in having the writs executed and the properties appraised. See Defendant the Democratic Republic of the Congo's Reply to Plaintiff's Response to Emergency Motion to Quash March 24, 2005, Writs of Execution at 18-19 (July 30, 2005). Cf. *Smith*, 430 F.3d at 457 n.5 (noting that "the award of costs and attorney's fees was aimed at remedying . . . prejudice."). Reconsideration imposes no cognizable prejudice on FG Hemisphere.

Third, the failure to file a timely response was in considerable measure out of the DRC's control. The movant's use of English rather than French virtually guaranteed the DRC's inability to file a timely response. Although we do not rule on the argument that service should have been governed by FSIA's service provision, 28 U.S.C. § 1608(a), we note that § 1608(a) calls for translation by the serving party, thus facilitating the sovereign's ability to make a timely response and

tending in part to overcome what *Practical Concepts* recognized as the "perils of converting the legal terms and concepts of one system into those of another." 811 F.2d at 1546. The absence of translation is comparable to the placement of the claim-filing deadline at the *bottom* of a letter entitled "Notice for Meeting of Creditors," an obscurity that the *Pioneer* Court found to militate in favor of creditors who had missed the deadline. 507 U.S. at 398-99. Further, it seems likely that much of the Motion's bouncing around the various departments within the DRC was due to substantial political and institutional differences between the United States and the DRC, which *Practical Concepts* exhorts us to consider. See 811 F.2d at 1546. Finally, of course, the DRC was plainly hampered by its devastating civil war, which cost over three million lives, shattered the DRC's already shaky political structure, and set off hyperinflation that peaked at over 500% per year in 2000. It is not surprising that the war would be accompanied by substantial confusion over responsibilities in the Foreign Ministry—indeed the Office of the Foreign Minister itself appears not to have any record of receiving the Motion. Cf. *Brenner v. Shore*, 297 N.E.2d 550, 553-54 (Ohio Ct. App. 1973) (vacating default judgment under parallel state rule 60(b)(1) because of "complete physical and mental collapse" of defendant).

FG Hemisphere points to the facts that the DRC sold electricity to neighboring countries, that DRC President Kabila visited East Asia with an entourage of 200 people, and that the DRC sent a delegation to Pope John Paul II's funeral, arguing that each of these supports a finding that DRC's neglect was inexcusable. But a polity's ability to fund foreign travel for its chief executive and other officials is hardly evidence of the sort of general state capacity that would make for swift and efficient handling of a DHL package with English-language materials. The delay here, then, seems like the sort of innocent neglect that

in the absence of prejudice or bad faith commonly qualifies as excusable.  See, e.g., *Walter v. Blue Cross & Blue Shield United of Wisconsin*, 181 F.3d 1198, 1201-02 (11th Cir. 1999) (finding excusable neglect in secretary's clerical error in failing to record deadline).

FG Hemisphere itself seems virtually to admit as much, see Oral Arg. Tape at 49:02 (conceding that "it is a record . . . [from] which one could conclude that it was excusable neglect."), in the end relying mainly on a number of points apparently thought to show the DRC's bad faith—the fourth express *Pioneer* factor. See *Pioneer*, 507 U.S. at 398; *Robb*, 122 F.3d at 362.  For example, it notes that the DRC participated actively in two litigations in the United Kingdom and Belgium.  FG Hemisphere doesn't explain why an erratic litigation record supports an inference of bad faith.  In fact, preoccupation with other litigation may even strengthen a finding of excusable neglect. See, e.g., *Kryzak v. Dresser Industries*, 118 F.R.D. 12, 13-14 (D. Me. 1987); see also WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2858 at 270-71 ("Relief has been given from a default suffered through the excusable neglect of counsel preoccupied with other litigation.").

Along the same lines FG Hemisphere argues that the DRC has engaged in a systematic litigation strategy aimed at frustrating creditors by artificial claims of diplomatic immunity. It points to the Belgian suit, where the court found immunity for a property formerly used by diplomatic personnel and allegedly under renovation to serve as the ambassador's residence.  Two months after the court's ruling the DRC sold the property.  We have no basis for trying to sort out the merits of this Belgian conflict, and fail to see how, even on the worst assumptions, it could show strategic behavior in the DRC's *defaulting* in its response to the Motion to Execute.

FG Hemisphere also espies chicanery in the contrast between the DRC's hiring of attorneys within one day of ex-ambassador Manata's telling the foreign ministry of the order to execute, and its earlier failure to participate in the litigation. FG Hemisphere doesn't explain why this might show bad faith rather than (at worst) rather chaotic neglect. And even if there was "strategy" in defaulting on the merits but resisting the execution, the strategy may have been simply to fight on issues where its merits position was strong; this is hardly reprehensible.

Finally, our cases (and those of other circuits) antedating *Pioneer* generally required a party seeking relief on grounds of excusable neglect to assert a potentially meritorious defense. See, e.g., *Lepkowski*, 804 F.2d at 1314; *Combs v. Nick Garin Trucking*, 825 F.2d 437, 441-42 (D.C. Cir. 1987); *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984); *Gross v. Stereo Component Systems, Inc.*, 700 F.2d 120, 122 (3d Cir. 1983). Since then other circuits have held, without much explanation, that the requirement survives *Pioneer*, even though that decision mentions no such criterion. See, e.g., *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 784 (8th Cir. 1998) ("[W]e believe the existence of a meritorious defense continues to be a relevant factor after *Pioneer*."); *TCI Group Life Ins. Plan v. Knoebber*, 244 F.3d 691, 696-97 (9th Cir. 2001) (noting that pre-*Pioneer* factors of culpable conduct, meritorious defense, and prejudice are "quite sufficient after *Pioneer* . . . to guide district courts' exercise of discretion under Rule 60(b)(1) in the context of default judgments"). Of course *Pioneer*'s list of factors was non-exclusive. And the requirement advances judicial economy: if the 60(b)(1) movant's substantive claim is plainly meritless, there seems little point in a nuanced treatment of data bearing on the excusability of the movant's neglect. Indeed, in a post-*Pioneer* case, we held that a potentially meritorious defense is a precondition for Rule 60(b) relief (without discussion of

*Pioneer*), reasoning that the movant must show "that vacating the judgment will not be an empty exercise or a futile gesture." *Murray v. District of Columbia*, 52 F.3d 353, 355-56 (D.C. Cir. 1995).

The DRC has met easily that standard. Under the FSIA the property of a foreign state is immune from execution subject to certain exceptions, 28 U.S.C. § 1609, the one asserted by FG Hemisphere being use of the property "for a commercial activity in the United States." 28 U.S.C. § 1610(a). See also 28 U.S.C. § 1603(d) (defining commercial activity as "a regular course of commercial conduct or a particular commercial transaction or act"); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (concluding "that when a foreign government acts . . . in the manner of a private player within [a market], the foreign sovereign's actions are 'commercial' within the meaning of the FSIA"). While FG Hemisphere bears the burden of producing evidence to show that immunity should not be granted, the DRC bears the ultimate burden of persuasion (i.e., to show that the commercial-activity exception does not apply). See *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994); *Robinson v. Government of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001). FG Hemisphere asserts that the commercial activity exception applies to the two dwellings because they have been occupied by persons other than accredited diplomats for over ten years and thus, FG Hemisphere asserts, are presumably held as "investment[s] in a rapidly-appreciating real estate market."

We are unconvinced. The fact that former diplomats squatted on the properties says little. FG Hemisphere's labeling the DRC as canny is implausible; the DRC entirely failed to collect rent on the properties for over a decade. FG Hemisphere counters that this was a payoff to the former diplomats and

hence a form of imputed rent to the DRC. But the far more likely explanation for the failure to pursue the squatters is that the DRC's political condition (including civil war) disabled its government from effectively protecting the state's interests. It appears undisputed that the Glenbrook and Linnean sites have been and are intended to be used as diplomatic residencies of DRC officials. Both the State Department and the District of Columbia have recognized the properties as diplomatic—and do so to this day. While the holdover diplomats may have invoked non-payment of wages to justify squatting, there is nothing to show that the DRC conceived of the relation as an indirect way of providing compensation. (We pass no judgment on whether, if such a relation existed, it would qualify as commercial.) So far as the record now appears, there is thus no evidentiary basis for believing that the properties have been "used for a commercial activity."

Because we find that the DRC's neglect was excusable and that the DRC's claim of immunity is potentially meritorious, we reverse the district court's denial of the DRC's Rule 60(b) motion and vacate the March 24 Order. As the DRC's neglect is excused, the district court must consider the merits as it would have if the DRC had filed a timely response. We thus remand for further proceedings on the merits.

*So ordered.*