# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 16, 2013        Decided November 1, 2013

No. 12-7103

BELL HELICOPTER TEXTRON, INC.,
A DELAWARE CORPORATION AND BELL HELICOPTER
TEXTRON CANADA, LTD., A CANADIAN CORPORATION,
APPELLANTS

v.

ISLAMIC REPUBLIC OF IRAN, A FOREIGN NATION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-01694)

*Kannon K. Shanmugam* argued the cause for appellants. With him on the briefs were *John K. Villa*, *Charles Davant IV*, and *Matthew H. Blumenstein*.

*Christopher J. Wright* argued the cause for appellees. With him on the brief was *Charles T. Kimmett*. *Thomas G. Corcoran Jr.* and *Laina Lopez* entered appearances.

Before: ROGERS and TATEL, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  Bell Helicopter Textron Inc. and Bell Helicopter Textron Canada Ltd. (together "Bell") appeal the vacatur of a default judgment as void in connection with the manufacture and marketing by the Islamic Republic of Iran ("Iran") of a helicopter that resembles Bell's Jet Ranger 206 in appearance.  Bell contends the district court made three errors in granting Iran's motion to vacate, pursuant to Federal Rule of Civil Procedure 60(b)(4), for lack of subject matter jurisdiction because: (1) the motion was subject to a reasonable time limit and thus untimely; (2) a deferential standard should have been applied whereby the default judgment could have been vacated only if there had been no arguable basis for jurisdiction; and (3) the commercial activity exception in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(2), applies. Bell's first two claims of error are contrary to this court's precedent, which we must apply, *see LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996), and its third claim of error fails for lack of evidence that Iran's commercial activity caused a "direct effect" in the United States.  Accordingly, we affirm.

**I.**

In the 1970s, Bell operated a helicopter plant in Iran, which it abandoned after the Iranian revolution of 1979.  In December 2002, Bell became aware that the Iran Aircraft Manufacturing Industrial Company ("HESA"), a company wholly owned and controlled by the Iranian government, was using the plant to manufacture helicopters that resembled the Jet Ranger 206. Bell designed this particular model to have distinctive but nonfunctional design features, including a protruding nose as opposed to a rounded front, based on an "automotive concept," which would set it and the Bell brand apart from other helicopters and helicopter manufacturers.  The Iranian helicopters went under the name Shahed, and the Shahed 278 resembles the Jet Ranger 206; the Shahed 285 is a militarized

version of the same helicopter. Iran has displayed prototypes of the Shahed at its annual air show held at Kish Island, Iran for international helicopter buyers for the purpose of selling them in what Bell's witness described as "Third World" markets where safety certification restrictions imposed by European and North American governments do not apply. Iran would not, however, be able to sell the Shahed in U.S. markets.

Bell sued Iran in 2006, alleging that Iran's manufacture and marketing of the Shahed helicopters infringed and diluted Bell's "trade dress" in violation of the Lanham Act, 15 U.S.C. § 1051 et seq., and infringed its design patent under the Patent Act, 35 U.S.C § 1 et seq. (The Patent Act claim was later dropped.) Bell served Iran with the complaint, but Iran did not appear. A default was entered against Iran on March 31, 2009, and the district court scheduled a hearing on damages for October 5, 2009. Iran contacted Bell to conduct settlement negotiations, but no agreement was reached prior to the hearing. At the hearing, Bell's witnesses included one of its staff engineers, who testified regarding the distinctive trade dress of the Jet Ranger 206 and Bell's primary customers, which include foreign militaries and "numerous commercial customers." *Ex Parte Hg.* Tr. at 28–36 (Oct. 5, 2009) (testimony of Douglas Jordan). An aviation safety consultant testified for Bell about the confusingly similar appearances of the Jet Ranger and the Shahed, Bell's "second to none" reputation for safety, and speculated regarding the possibility that Shahed helicopters could be "passed off" as Bell products in "Third World" markets with the resulting risk of accidents from the use of Shahed parts in Bell helicopters. *Id.* at 38–48 (testimony of Vernon Albert). A Bell manager testified regarding the potential loss of Bell revenues as a result of the sale of Shahed helicopters. *Id.* at 49–54 (testimony of Terry Jeffcoat).

4

The district court issued an order and default judgment against Iran on February 11, 2011, ruling that Iran had infringed and diluted Bell's "trade dress" in violation of the Lanham Act, and that Iran was not immune from suit because its actions were commercial and had a "direct effect" in the United States. *Bell Helicopter Textron Inc. v. Islamic Republic of Iran*, 764 F. Supp. 2d 122, 126, 127–28 (D.D.C. 2011) ("*Bell I*"). It awarded Bell $22,035,002.28 in damages (adjusted for pre-judgment interest) and $497,125 in attorneys fees. *Id.* at 129–30. The State Department filed on October 19, 2011 an affidavit of service of the default judgment on Iran, and counsel for Iran entered an appearance on December 28, 2011. On February 10, 2012, Iran moved, pursuant to Rule 60(b)(4), to vacate the default judgment as void due to lack of subject-matter jurisdiction. Upon reviewing *de novo* whether it had subject-matter jurisdiction, the district court granted the motion, ruling that Iran was immune from suit under the FSIA because Bell had not presented evidence that Iran's actions had caused a "direct effect" in the United States. *Bell Helicopter Textron Inc. v. Islamic Republic of Iran*, 892 F. Supp. 2d 219, 225, 234 (D.D.C. 2012) ("*Bell II*").

Bell appeals, and our review of the question of law is *de novo*, *see Smith v. Mallick*, 514 F.3d 48, 50 (D.C. Cir. 2008); the subsidiary facts are undisputed. Although Rule 60(b) motions are generally committed to the discretion of the district court, and thus subject to review for abuse of discretion, "there is no question of discretion on the part of the court when a motion is under Rule 60(b)(4); if the judgment is void, relief is mandatory." *Combs v. Nick Garin Trucking*, 825 F.2d 437, 441 (D.C. Cir. 1987) (footnote and internal quotation marks omitted).

## II.

Rule 60(b)(4) of the Federal Rules of Civil Procedure provides that a court "may relieve a party . . . from a final judgment" if "the judgment is void." Bell contends that a Rule 60(b)(4) motion is subject to the limitation in Rule 60(c)(1) that a Rule 60(b) motion be "made within a reasonable time," and Iran's motion, which was filed 364 days after entry of the default judgment, surpassed this limit. For support, Bell points to *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 264 (2010), where the Supreme Court stated:

> Rule 60(b)(4) strikes a balance between the need for finality of judgments and the importance of ensuring that litigants have a full and fair opportunity to litigate a dispute. Where, as here, a party is notified of a [bankruptcy] plan's contents and fails to object to confirmation of the plan before the time for appeal expires, that party has been afforded a full and fair opportunity to litigate, and the party's failure to avail itself of that opportunity will not justify Rule 60(b)(4) relief.

*Id.* at 276.

Bell ignores this circuit's precedent as well as the fact that in *Espinosa*, the Supreme Court stated that it was "not persuaded that a failure to find undue hardship in accordance with [the Bankruptcy Code] is on par with the jurisdictional and notice failing that define void judgments that qualify for relief under Rule 60(b)(4)." *Id.* at 273. Here, the district court was faced with a subject-matter jurisdiction challenge, not a claim of procedural deficiency. In *Espinosa*, the creditor participated in the Bankruptcy Court proceedings by filing a proof of claim, did not object to the non-jurisdictional legal error, and then years

later asked for a second bite at the apple. *See id.* at 264–66. Here, Iran never participated in the district court proceedings that led to the default judgment and moved to vacate based on the district court's lack of subject-matter jurisdiction. Ensuring finality by imposing time limits on Rule 60 motions makes sense in situations similar to *Espinosa* where a party submits to the court's jurisdiction, never objects to a non-jurisdictional error, and subsequently in a collateral challenge raises that error as a basis to vacate the final judgment. But absent any indication that the Supreme Court would apply the same standard in the materially different circumstances of the instant case, this court's precedent controls, and the district court did not err in rejecting Bell's argument that Iran's Rule 60(b)(4) motion was untimely.

In *Austin v. Smith*, 312 F.2d 337, 343 (D.C. Cir. 1962), this court held that Rule 60(b)(4) motions are not governed by a reasonable time restriction. In that case the Rule 60(b)(4) movant had not appeared in the proceeding that resulted in a default judgment but challenged the judgment more than four years later on the grounds that he had never received notice that a suit had been filed. *Id*. at 339–40. This court held:

> Under [Rule 60(b)(4)]. . ., the only question for the court is whether the judgment is void; if it is, relief from it should be granted. . . . Moreover, the Rule places no time limit on an attack upon a void judgment, nor can such a judgment acquire validity because of laches on the part of him who applies for relief from it.

*Id*. at 343. Similarly, in *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1545 (D.C. Cir. 1987) ("*Practical Concepts*"), the court rejected the argument that a Rule 60(b)(4) motion was barred when filed by a foreign sovereign over a year after a default judgment was entered.

The RESTATEMENT (SECOND) OF JUDGMENTS § 65 comment b (1982), explains regarding default judgments that "no public purpose is served by protecting [a] judgment" arising from a "proceeding [that] was infected by fundamental error." According to the Rules Advisory Committee, no substantive change has been made to Rule 60(b)(4) since *Austin v. Smith* was decided in 1962. *See* FED. R. CIV. P. 60(b)(4) advisory committee's note (1987 and 2007). Bell's interpretation of Rule 60(b)(4) is contrary to this court's precedent, as well as that of almost every other circuit court of appeals, all of which reject a time limit that would bar Rule 60(b)(4) motions.[1]

## III.

"Under [Rule 60(b)(4)] . . ., the only question for the court is whether the judgment is void . . . ." *Austin*, 312 F.2d at 343. Bell cites cases from circuits that interpret the word "void" narrowly where a judgment is void only "when there is a total want of jurisdiction and no arguable basis on which [the district court] could have rested a finding that it had jurisdiction," *Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 190 (2d Cir. 2003) (internal quotation marks omitted). It points to *Espinosa*, 559 U.S. at 271, where the Supreme Court observed that multiple courts of appeals "generally have reserved relief

---

[1] *See Precision Etchings & Findings, Inc. v. LGP Gem, Ltd.*, 953 F.2d 21, 23 (1st Cir. 1992); *"R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 123–24 (2d Cir. 2008); *United States v. One Toshiba Color Television*, 213 F.3d 147, 157 (3d Cir. 2000) (en banc); *In re Heckert*, 272 F.3d 253, 256–57 (4th Cir. 2001); *Jackson v. FIE Corp.*, 302 F.3d 515, 523–24 (5th Cir. 2002); *Philos Techs., Inc. v. Philos & D, Inc.*, 645 F.3d 851, 857 (7th Cir. 2011); *Orner v. Shalala*, 30 F.3d 1307, 1310 (10th Cir. 1994); *Hertz Corp. v. Alamo Rent-A-Car, Inc.*, 16 F.3d 1126, 1130–31 (11th Cir. 1994); *see also* 11 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2862 (3d ed. 2013).

[pursuant to Rule 60(b)(4)] only for the exceptional case in which the court that rendered judgment lacked even an 'arguable basis' for jurisdiction." Bell effectively ignores this court's precedent in *Practical Concepts* adopting a broader interpretation of "void" where a judgment is "void" whenever the issuing court lacked jurisdiction.

The Supreme Court has long instructed that judgments in excess of subject-matter jurisdiction "are not voidable, but simply void." *Elliott v. Peirsol's Lessee*, 26 U.S. (1 Pet.) 328, 340 (1828); *accord Gonzalez v. Crosby*, 545 U.S. 524, 534 (2005); *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938). Under this traditional rule, "[w]hen a federal court reaches beyond its statutory grant of subject-matter jurisdiction, its judgment is void." *Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487, 492 (D.C. Cir. 1984). Bell does not contest this principle but instead maintains that "once final judgment has been entered, the calculus changes," Appellants' Reply Br. 9, principally relying on the interest in preserving the finality of judgments. It cites cases that generally distinguish between an error in the exercise of jurisdiction, as might occur in interpreting a statutory grant of jurisdiction, and a total want of jurisdiction when the court's judgment was a plain usurpation of power for which no arguable basis existed. *See infra* note 3. "[T]he principle of finality," however, "rests on the premise that the proceeding had the sanction of law, expressed in the rules of subject matter jurisdiction." RESTATEMENT (SECOND) OF JUDGMENTS § 12 cmt. a. A judgment remains void even after final judgment if the issuing court lacked subject-matter jurisdiction, regardless of whether there existed an "arguable basis" for jurisdiction.

This court has applied the traditional understanding of voidness in reviewing Rule 60(b)(4) motions *de novo*. In *Practical Concepts*, 811 F.2d at 1545, the district court issued a

default judgment against the Republic of Bolivia. Bolivia, although aware of the initial proceedings, had not appeared and later challenged the judgment for lack of personal and subject-matter jurisdiction. *Id.* The district court followed "[t]he traditional rule . . . that a judgment rendered in excess of the court's jurisdiction is void and a legal nullity." *Practical Concepts, Inc. v. Republic of Bolivia*, 613 F. Supp. 863, 867 (D.D.C. 1985) (citing RESTATEMENT (FIRST) OF JUDGMENTS §§ 5–7 (1942)). On appeal, this court held that "the district court . . . properly allowed *full consideration* of [the] jurisdictional objection." *Practical Concepts*, 811 F.2d at 1545 (emphasis added). Although the court did not explicitly endorse the traditional construction of voidness adopted by the district court, much less refer to its own review as *de novo*, its analysis and the content of the district court's analysis make both clear.

The district court expressly declined to apply a version of the arguable basis standard, rejecting a construction of voidness that would distinguish between "a total want of jurisdiction" and "an error in the exercise of jurisdiction." *Practical Concepts*, 613 F. Supp. at 866–67 (quoting *Lubben v. Selective Serv. Sys. Local Bd. No. 27*, 453 F.2d 645, 649 (1st Cir. 1972)). It rejected the distinction adopted in cases Bell now cites because they failed to distinguish between voidness and issue preclusion. *Id.* at 867. The district court stated that "where . . . the defendant never appeared in the original suit and thus has not yet litigated the point, he is not excepted from the rule that a jurisdictional defect renders a judgment void." *Id.* (citing *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982), and *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1099 n.9 (D.C. Cir. 1982), *cert. denied*, 464 U.S. 815 (1983)).

This court elaborated on appeal that "[w]hen a person named as a defendant knows about the action but perceives that

the court lacks territorial or subject matter jurisdiction, he is given a right to ignore the proceeding at his own risk but to suffer no detriment if his assessment proves correct." *Practical Concepts*, 811 F.2d at 1547 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 65 cmt. b (alterations omitted)). The court identified two risks a party takes in declining to appear: (1) "the inconvenience of having its assets subjected to judicial process following the entry of the default judgment," and (2) "the prospect that it might lose its chance to argue the merits of the suit." *Id.* at 1548 (alterations and internal quotation marks omitted). Had the court concluded the defaulting party would have to overcome a narrow construction of voidness under Rule 60(b)(4), it could not have held that the district court properly gave "full consideration" to Bolivia's jurisdictional objections upon *de novo* review, particularly when the district court had rejected the arguable basis standard. The arguable basis standard would create a high risk for parties who choose not to appear, and omission of reference to it further indicates that in holding "*full* consideration" was appropriate the court endorsed the traditional understanding of voidness applied by the district court.

Bell maintains that in *Practical Concepts* this court did not say that a foreign state would be entitled to *de novo* review whenever it asserted its jurisdictional objection. But this simply ignores what the court's analysis reveals (as well as that of other circuit courts of appeals holding that non-appearing parties may obtain *de novo* review of jurisdictional challenges when appearing for the first time[2]) and betrays a misunderstanding of

---

[2] *See, e.g.*, *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 437–40 (6th Cir. 2002); *MCI Telecomms. Corp. v. Alhadhood*, 82 F.3d 658, 661–64 (5th Cir. 1996); *Exp. Grp. v. Reef Indus., Inc.*, 54 F.3d 1466, 1469–71 (9th Cir. 1995); *King Fisher Marine Serv., Inc. v. 21st Phoenix Corp.*, 893 F.2d 1155,

how the principles of *res judicata* apply to jurisdictional determinations. Where a defendant "w[as] given a fair chance to challenge . . . subject-matter jurisdiction," the issuing court's determination of jurisdiction is *res judicata* and may not be challenged in a collateral proceeding in the district court but only on direct appeal. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153 (2009). An exception exists "where the issue is the waiver of [sovereign] immunity." *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 514 (1940); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 12. In virtually all of the cases Bell describes as creating a "formidable phalanx of case law" in support of the arguable basis standard, Appellants' Br. 26, the objecting party had appeared in the challenged proceeding or by privity was subject to the principles of *res judicata*.[3] In the one case cited by Bell applying the arguable basis standard to a non-appearing defendant in the context of a Rule 60(b)(4) motion, the court in *Central Vermont Public Service Corp. v. Herbert*, 341 F.3d at 188, did not distinguish between parties who have appeared and could have litigated jurisdiction but did not and those that declined to enter an appearance altogether; nor was

---

1158 (10th Cir. 1990); *cf. Budget Blinds, Inc. v. White*, 536 F.3d 244, 260 (3d Cir. 2008).

[3] *United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 659 (1st Cir. 1990); *Nemaizer v. Baker*, 793 F.2d 58, 60 (2d Cir. 1986); *Marshall v. Bd. of Ed.*, 575 F.2d 417, 420 (3d Cir. 1978); *Wendt v. Leonard*, 431 F.3d 410, 411–12 (4th Cir. 2005); *Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d 204, 206–07 (5th Cir. 2003); *In re G.A.D., Inc.*, 340 F.3d 331, 333–34 (6th Cir. 2003); *United States v. Tittjung*, 235 F.3d 330, 333–34 (7th Cir. 2000); *Kansas City S. Ry. Co. v. Great Lakes Carbon Corp.*, 624 F.2d 822, 823–24 (8th Cir. 1980) (en banc); *Gschwind v. Cessna Aircraft Co.*, 232 F.3d 1342, 1344 (10th Cir. 2000); *Oakes v. Horizon Fin., S.A.*, 259 F.3d 1315, 1316 (11th Cir. 2001) (per curiam).

the defendant a foreign sovereign. Even so, it is not in accord with this circuit's precedent.

Because Iran never appeared in the district court proceeding resulting in the default judgment, the district court properly applied the traditional definition of voidness in granting Iran's Rule 60(b)(4) motion.

## IV.

The FSIA "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992). "[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," unless one of the enumerated exceptions applies. 28 U.S.C. § 1604. Bell relies on the commercial activity exception, which provides, in relevant part, that a foreign state is not immune when "the action" in question "is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id*. § 1605(a)(2).[4] Bell contends, contrary to

---

[4] The commercial activity exception to the FSIA provides that a foreign state does not enjoy jurisdictional immunity in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2); *see also id.* § 1603(d).

the district court's findings, that there was evidence that Iran's production and marketing of the Shahed helicopters abroad caused a "direct effect" in the United States. Although no circuit court of appeals has addressed whether intellectual property infringement occurring abroad can cause a "direct effect" in the United States, Bell suggests that under intellectual property case law the effect of infringement occurs where the possessor of the intellectual property lives.

Preliminarily, we note that Bell's procedural objections fail. First, Bell has forfeited the issue of which party has the burden of production of evidence to show "direct effects." While initially contending that Iran made no effort to meet its evidentiary burden that its actions caused no direct effect in the United States, *see* Appellants' Br. 36, in response to Iran's statement that it was not challenging the underlying facts, *see* Appellee's Br. 38, Bell shifted gears, stating that it did not mean that Iran had the burden of production but instead the burden of persuasion, *see* Reply Br. 21. This last minute pivot is problematic because in its opening brief Bell stated the burden of production was the issue. *See* Appellants' Br. 35–36. Issues first raised in a reply brief are ordinarily presented too late to be considered by the court because the other party has no chance to respond. *See Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir. 2001). Second, Bell's suggestion that the district court gave Iran an improper advantage by emphasizing the presumption of immunity under the FSIA, *see* Appellants' Br. 36–37, overlooks that the FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies, *see FG Hemisphere Assocs., LLC. v. Dem. Rep. Congo*, 447 F.3d 835, 842 (D.C. Cir. 2006); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002), and once shown, the sovereign bears the ultimate burden of persuasion to show the exception does not apply, *see FG*

*Hemisphere Assocs.*, 447 F.3d at 842. The district court did not err in ruling Bell failed to meet its initial burden.

In *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992), the Supreme Court held that for acts outside the territory of the United States to cause direct effects in the United States under the FSIA, "an effect is direct [only] if it follows as an immediate consequence of the defendant's activity." *Id.* at 618 (internal quotation marks omitted). The Court acknowledged that the commercial activity exception did not "contain[] any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Id.* Still, the effect must be more than "purely trivial," and reputational harm "(assuming it is not too speculative to be considered an effect at all) is too remote and attenuated to satisfy the 'direct effect' requirement of the FSIA." *Id*. The Court concluded that Argentina's unilateral rescheduling of its bonds had a direct effect in the United States, not because of any diminishment to New York's status as a world financial leader, but because the bond holders "had designated their accounts in New York as the place of payment and Argentina made some interest payments into those accounts before announcing" the rescheduling, and consequently, "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619.

This court in *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994), explained that a direct effect "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption," *id*. at 1172 (internal quotation marks omitted). It rejected Princz's claim that his forced labor for the Nazis during World War II had a direct effect in the United States by aiding the Nazi war effort because too "[m]any events and actors necessarily intervened between any work that Mr. Princz performed — as a bricklayer for I.G. Farben in Poland or as a laborer in the Messerschmidt aircraft

works in Germany — and any effect felt in the United States." *Id*.; *see also id.* at 1172–73; *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988).

Bell maintains the requisite "direct effect" in the United States from Iran's infringement and dilution of Bell's intellectual property were both financial and reputational. It points to the invasion of its exclusive right to reap the financial, reputation-related rewards associated with its desirable product, which is essentially a financial effect. On the other hand, the harm to Bell's reputation as a producer of safe aircraft, the loss of the ability of Bell's "trade dress" to serve as a unique identifier, and the diminishment of Bell's incentive to product a quality product are basically reputational effects.

Interference with a property right does not necessarily demonstrate a "direct effect" under the FSIA. In *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 34 (2d Cir. 1993), a Delaware limited partnership, with its primary place of business in New York, sued Nigeria for detaining the partnership's sole asset (an aircraft) because a prior lessee had failed to pay fees that were due. All of the tortious acts occurred outside of the United States. *Id.* at 36. Citing the Supreme Court's focus in *Weltover* on the breached contract's place of performance, the Second Circuit stated that "[i]n tort, the analog to contract law's place of performance is the locus of the tort." *Id.* The court concluded, notwithstanding interference with a U.S. corporation's property rights held in the United States, that no "direct effect" from the property tort had occurred in the United States because "[t]he tort . . . began in Nigeria with the detention of the aircraft and ended in Nigeria with the payment of the money." *Id.* "[T]he fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception" to immunity because:

> [i]f a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states. Many commercial disputes, like the present one, can be pled as the torts of conversion or fraud and would, if appellant is correct, result in litigation concerning events with no connection with the United States other than the citizenship or place of incorporation of the plaintiff.

*Id.*; *see Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010); *Virtual Countries, Inc., v. Republic of S. Afr.*, 300 F.3d 230, 240 (2d Cir. 2002); *see also Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212, 1217 (11th Cir. 2005); *cf. United World Trade Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1237–39 (10th Cir. 1994).

This court reached a like conclusion in *Cruise Connections Charter Management 1, LP v. Attorney General of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010), stating that the FSIA's "direct effect" requirement is not satisfied when a "plaintiff's U.S. citizenship furnished the only connection between the commercial activity and the United States," *id*. In that case, the Canadian government's breach of a contract with a U.S. company to provide cruise ship services in Canada caused a "direct effect" because the U.S. company was unable to consummate fully negotiated, multi-million dollar subcontracts with U.S.-based cruise lines. *Id.* at 663–65. Similarly in *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101 (D.C. Cir. 2001), *vacated in part on other grounds*, 320 F.3d 280 (D.C. Cir. 2003), the court identified as a "direct effect" of Iran's expropriation of an American corporation's interest in a company "the cut-off of the constant flow of capital,

management personnel, engineering data, machinery, equipment, materials and packaging between the [American and Iranian] companies, as well as the abrupt end of McKesson's role as an active investor [in the foreign company]." *Id.* at 1105 (citations and internal quotation marks omitted). Bell has offered no analogous evidence of a "direct effect."

In the district court, Bell did not offer evidence that Iran had sold or advertised the Shahed in the United States. Instead, Bell focused on the physical similarity between the Shahed and the Jet Ranger 206 and potential financial and reputational loss, *see Bell II*, 892 F. Supp. 2d at 227, but the evidence regarding any effect on Bell was remote or speculative. For example, the only evidence of customer confusion was testimony from an aviation safety consultant who had formerly been a Bell customer that he was confused when he was "shown a picture" of the Shahed. The district court noted any confusion was momentary because the caption of the picture identified the two helicopters by name. *Bell II*, 892 F. Supp. 2d at 230, 232. Bell presented no evidence that any of its current or potential customers were likely to encounter the Shahed in the regular course of doing business. Neither did Bell offer evidence that any consumer had contemplated buying a Shahed rather than a Jet Ranger, much less done so thinking the Shahed was associated with Bell. Nor did Bell offer evidence that any consumer had refrained from buying a Bell product because an association between the Shahed and the Jet Ranger had tainted Bell's reputation. Yet under the Lanham Act, "the inquiry is whether the buying public is likely to believe that defendant's services come from the same source, or are affiliated with the trademark owner." *Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 639 (D.C. Cir. 1982). Failing to show that "revenues that would otherwise have been generated in the United States were 'not forthcoming,'" *Cruise Connections*, 600 F.3d at 665 (quoting *Weltover*, 504 U.S. at 619), Bell likewise presented no evidence that there is any

crossover between the market for Bell spare parts and the market for Shahed spare parts, or that such crossover is substantially likely.

To the extent Bell hypothesizes the loss of the incentive to create quality products, the effect in the United States is too attenuated to meet the requirement in *Weltover*, 504 U.S. at 618, that the effect be "immediate." *See also Princz*, 26 F.3d at 1172. To create the kind of disincentive Bell suggests, the effect of Iran's actions on Bell's sales would have to reach levels at which Bell determined that investment it would have made is no longer worthwhile. Notwithstanding the absence of any evidence that the Shahed has affected Bell's sales, Bell's incentive-based theory would require the intervention of a host of actors and would not be a direct consequence of Iran's production of what a Bell witness described as consisting of a handful of Shahed helicopters, *see Ex Parte Hg.* Tr. at 21 (testimony of David Chant).

Bell's response is that intellectual property torts are different from other property torts because of the importance of protecting intellectual property in a way that allows a producer to reap the financial and reputational rewards of its product and preserves incentives for trademark owners to produce quality products. Bell points to cases regarding Lanham Act protections and asserts that "infringement of [intellectual property] rights directly harms the owner where it lives." Appellant's Br. 39 (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163–64 (1995) and *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243–44 (2d Cir. 2009)). It is conceivable that Bell's interests might be harmed by Iran's production of the Shahed, but that is not the focus of the "direct effect" jurisdictional requirement. *See Cruise Connections*, 600 F.3d at 666. The premise of Bell's response ignores the rationale of the precedents holding that the victim of a commercial tort abroad does not establish a "direct

effect" in the United States under the FSIA simply by virtue of its U.S. citizenship. *See id.* at 665; *Antares*, 999 F.2d at 36; *see also Noxell Corp. v. Firehouse No.1 Bar-B-Que Rest.*, 760 F.2d 312, 317 (D.C. Cir. 1985). The cases that Bell cites generally discussing Lanham Act protections, *Qualitex Co.*, 514 U.S. at 161, and *Zino Davidoff*, 517 F.3d at 242–43, involved sales in the United States. So do the two district court cases Bell cites on a foreign sovereign's extraterritorial infringement of intellectual property causing a "direct effect" in the United States. In *CYBERsitter, LLC v. People's Republic of China*, 805 F. Supp. 2d 958, 976 (C.D. Cal. 2011), the People's Republic of China made misappropriated software code available on the internet, and individuals could download it in the United States. In *Supra Medical Corp. v. McGonigle*, 955 F. Supp. 374, 377 (E.D. Pa. 1997), the defendants were developing and testing infringing technology in the United States. Neither case would eviscerate the jurisdictional immunity of foreign states to suits in U.S. courts involving intellectual property torts committed against U.S. corporations. Yet that would be the consequence of Bell's position that all instances of a foreign sovereign's infringement of a U.S. corporation's intellectual property have a "direct effect" in the United States.

Because Bell's evidence regarding the effect in the United States of Iran's commercial activities abroad is either "too remote and attenuated to satisfy the 'direct effect' requirement of the FSIA" or "too speculative to be considered an effect at all," *Weltover*, 504 U.S. at 618, the district court did not err in ruling the commercial activity exception in the FSIA did not apply.

Accordingly, we affirm the judgment of the district court.